## BELLOWS *vs.* STONE & a.

A plaintiff in equity cannot set up in his bill of complaint one contract, and obtain the relief he seeks, upon the admission or proof of another contract of a different character, even though the relief he seeks would be the appropriate remedy in the case as proved, or admitted by the defendant.

But the court may, in such case, grant leave to amend the bill, so as to conform to the case proved. And this, even after a hearing on the bill, answer, and evidence.

A voluntary surrender of premises by the mortgagor, after judgment of foreclosure, and even the taking of a lease from the mortgagor which recites the judgment, merely gives ordinary peaceable possession to the mortgagee, not possession under the judgment.

A court of equity will receive parol evidence of a mistake in drawing a written agreement, as well on the part of the plaintiff who seeks to procure a reformation of the same, and to have it afterwards enforced, as on the part of a defendant who seeks to resist its performance.

Where there were mutual misapprehensions as to such an agreement, the court, although they cannot reform the agreement, will afford relief by causing it to be set aside.

This, however, should be done by an application on the law side of this court, not by a decree in chancery.

BILL IN EQUITY. The bill, which was filed by Josiah Bellows, 2d, against David Stone and Josiah Bellows, 3d, partners, under the name of Stone & Bellows, and against Thomas Bellows, states that prior to January 1, 1821, the orator was in partnership in merchandise with Thomas Carlisle, of Lancaster, under the firm of Thomas Carlisle & Co., and was also engaged in various mercantile transactions in which Carlisle did not participate.

On the 21st of March, 1821, the firm of Thomas Carlisle & Co. failed, and on Sept. 9, 1823, their entire effects were assigned to Thomas Carlisle, and by him to the creditors of the firm, certain of whom, considered and denominated *honorary*, were to be first paid from those effects, and the residue of the fund devoted, as far as it would go, to the payment *pro rata* of the other class of creditors. Certificates were issued to each of the creditors by their attorney, which indicated the amount and class of their demands respectively,

and the members of the firm released from their debts.    The orator was entitled to an honorary certificate of $5300.

David Stone and Josiah Bellows, 3d, traders at Walpole, under the firm of Stone & Bellows, had, previous to Sept. 9, 1823, become liable as sureties for the orator at the banks; for the discharge of which liabilities he then induced them to raise at the Cheshire Bank $2900, and give their note; and for their security for that, and whatever other liabilities they might be under on his account, he caused the certificate of $5300 to which he was entitled, to be issued to them and in their names.    Then, as an indorser was necessary upon the note to the Cheshire Bank, he procured Thomas Bellows to sign as such, by mortgaging to him the Stanley farm, in Lancaster, with condition to pay the said Thomas Bellows, or his assigns, &c., the said certificate.

There was afterwards paid from the creditor's fund upon this certificate, Sept. 8, 1825, $700; Feb. 13, 1826, $1500, to Stone & Bellows; and on Sept. 15, 1830, $400 to Thomas Bellows by the orator from his own funds.    And the bill states that the orator is not otherwise indebted to the said Stone & Bellows, or Thomas Bellows, than for the balance of the $2900 note and interest, deducting the above payments.    And that he is and always has been ready to pay all sums due to them on account of the premises, upon their being ascertained; and that upon such payment he is entitled to a return of the certificate, and to hold the Stanley farm clear.

Stone & Bellows caused a writ of entry upon the mortgage aforesaid to be sued out and entered at the May term of the superior court of judicature in Coos, 1831, upon which, being continued to May term, 1832, judgment was rendered for the plaintiff, Thomas Bellows, under the following circumstances:

It was verbally agreed between the respective counsel of the parties that a nominal judgment for $5000 should be entered for the plaintiff, to stand as security for what should

be found due upon reference to George B. Upham of the accounts between the orator and Stone & Bellows and Thomas Bellows. But the written agreement was improvidently, and through accident or mistake, made as follows : "— that the conditional judgment rendered as of mortgage in favor of the plaintiff for $5000, and the subject of the claims between Bellows & Stone and the plaintiff, on the one side, and the defendant on the other, is to be referred to George B. Upham, Esq., as an auditor, and any sum which he may find due on the adjustment of such claims, in favor of the defendant, shall be deducted from said sum of $5000, or indorsed on the same." That at the hearing before said Upham, which was Jan. 29, 1834, the defendant set up the judgment for $5000, and objected to any proof affecting its validity, or tending to show that the certificate was other than the property of Stone & Bellows, and given them as and for collateral security only. And the said Upham was of opinion that he was authorized only to allow in favor of said orator such payments or demands in off-set as he could show in reduction of the judgment. So no investigation and adjustment of the mutual demands of the orator and the respondents could then be, or has ever since been, had.

In April, 1833, the orator signed and delivered to Thomas Bellows, or the said Stone & Bellows, a paper, to the effect that the equity of redemption in the said Stanley farm should be foreclosed by the first of April, then next, unless the sum due should be sooner paid, and prays a discovery of its contents.

That the orator called on them to render an account of the avails of the certificate, and of the amount of their payments in respect thereof, and to come to an adjustment of all the said concerns and business between them, and trusted they would have rendered a just, true, and full account of all payments made to them on account of said certificate, and the payments made by them in the premises; but they have not done so.

That the defendants sometimes pretend that the certificate for $5300 was given for a debt due from Carlisle & Co. to Stone & Bellows, and not for a debt due the orator, and that the same was procured and delivered by him to Stone & Bellows, as collateral security, to indemnify them against said note to the Cheshire Bank and such other liabilities as they might have been under for and on account of the orator. The contrary of which he charges to be the truth, and that said certificate was procured and delivered by him to Stone & Bellows, as collateral security to indemnify them against the liabilities aforesaid, and was given for the proper debt of Carlisle & Co. to him, and for no other account or consideration whatever.

The bill concludes with a prayer that the defendants may render a just and true account of all sums of money received by them, or either of them, on account of the said certificate executed to the said Stone & Bellows by the creditors of the said Thomas Carlisle & Co. or otherwise ; and of all sums of money paid by them upon the note executed as aforesaid to the Cheshire Bank for the said sum of $2900, and for all other sums of money paid by them, or either of them, for any liabilities which they, or either of them, were under for and on account of your orator; and that an account may be taken thereof; and that, upon the payment of such sum, if any, as may appear to be due to the defendants, or either of them, on the balance of the account so taken, your orator may be at liberty to redeem the said premises from the mortgage aforesaid.

The answer of David Stone and Josiah Bellows, 3d, states that they traded in partnership, under the firm of Stone & Bellows, in Walpole, from 1807 to 1826, and during that time had various dealings with the orator, being his creditors, and liable for him to so large an amount as to perplex their affairs and to impair their credit. The firm of James Dewey & Co., of which the orator was a member, owed them a note of $772.97, drawn Sept. 7, 1820. Among their

liabilities on account of him was a draft drawn by him on Wyman & Stone, of Boston, and indorsed by Stone & Bellows for $2000, Jan. 20, 1821, and sundry notes at the Cheshire Bank, amounting to more than $3000, signed by them for his sole benefit. And a note signed by them with the orator for $15,000, payable to James Lee & Co., Dec. 20, 1819, one half of which it was his duty to have paid. This was secured by a mortgage of the Boggy Meadow farm, in which the three joined.

The orator, on March 26, 1821, mortgaged to Josiah Bellows, 3d, certain property in Lebanon, N. H., valued at $6000, consisting of mills, locks and canals, and the Farrar farm, on condition to be void on payment to J. Bellows, 3d, and Stone & Bellows, of all and singular the sums of money, together with all costs and expenses which might arise in consequence of all and singular the liabilities of J. Bellows, 3d, and Stone & Bellows, for and on account of the orator.

April 29, 1822, the orator made his note to Stone & Bellows for $5338.35, one year and interest, as security to them from their debts and liabilities aforesaid, or any other debts or liabilities which might thereafter arise to them, on his account, and secured it by a mortgage of the same property ; for which purpose he likewise conveyed to them his interest in the Boggy Meadow farm, August 24, 1822, and empowered them to sell it.

On the 9th of September, 1823, the orator was indebted to Stone & Bellows $5149.46, (as per schedule,) on account of debts due to them, monies advanced, and services rendered to and for him ; for security of which they then held the Lebanon property, mortgaged as above mentioned, and the balance of the proceeds of the sale of the Boggy Meadow farm. The orator being desirous to sell the Lebanon property, proposed to them to substitute for it, as an equivalent security, the certificate for $5300, mentioned in the bill ; also another certificate of an unpreferred debt of Carlisle & Co., of $868.51, to be held by them for all sums then due them,

and all monies advanced, and services performed ; and, upon their objecting to the sufficiency of these certificates, he likewise proposed to secure the payment of the certificate of $5300, by a mortgage of the Stanley farm, in Lancaster, to be holden by them as security as aforesaid.    They having occasion to borrow for their own use $2900 of the Cheshire Bank, procured Thomas Bellows to sign a note as their surety for that purpose, by undertaking to have the Stanley farm mortgaged by the orator to him, to be held by him for his indemnity, and in trust ;   also to pay to Stone & Bellows whatever he might receive beyond, upon the mortgage and certificate, or to convey to them the mortgaged premises upon being so indemnified.   This was done, and Stone & Bellows released to the orator the Lebanon property, who thereupon conveyed it to M. & M. Harris, and delivered to Stone & Bellows the certificates for the purpose aforesaid.

The answer denies that the orator procured them to raise $2900 for his use at the Cheshire Bank, and alleges that they had already paid all the debts there and elsewhere for which they had been holden on his account, and that the certificate was delivered to them to secure to them whatever sums were then due and owing to them from the plaintiff, or which might become due to them on his account, and for no other purpose, and that the mortgage was made for the purposes aforesaid and for no other purpose.

The answer then sets forth the writ of entry and judgment on the mortgage, as charged in the bill, and the written agreement of the counsel, and denies that the judgment was nominal or through mistake, or that it has ever been satisfied or annulled ;  denies that the agreement of counsel aforesaid was signed through mistake ; and that the orator has ever availed himself of it, though he might, for the purpose of reducing the judgment.

They also answer, that in April, 1833, Thomas Bellows entered and took possession of the Stanley farm, for condition broken, and leased it to the orator, who attorned for the same,

and that he continued in peaceable possession for one whole year, and thereby foreclosed the redemption; discovers the contents of the paper referred to in the bill, and sets it out. It bears date April 1, 1833, and is signed and sealed by the orator, who thereby acknowledges himself the tenant of said farm to Thomas Bellows, covenants to pay rent, $300, to prevent waste, and to deliver up the premises at the end of one year. And this entry, attornment and possession, Stone & Bellows insist upon as a full bar, discharge, and extinguishment of the complainant's rights.

But if the court should be of opinion that the redemption is not foreclosed, and that the said Stone & Bellows should account, they say that the orator was, Sept. 9, 1823, indebted to them in the balance of account exhibited in the schedule above referred to, $5149.46. They thereupon cast interest with annual rests; add a few small charges, amounting to $45.06; deduct the payments charged in the bill, amounting to $2600; and find a balance, April 14, 1834, of $5707.13. And they aver that that sum is the sum to secure which said certificates were given to them, and which, with interest thereon, he is bound in equity to pay before he is entitled to a return of the same and a discharge of said mortgage.

Stone & Bellows also find a farther answer in the case, of which the following is an abstract.

They answer to the inquiry, " was there any report of the auditor upon the merits of the cause," by setting out the auditors report, *in hæc verba.*

" Claremont, January 29, 1834.

" In pursuance of the annexed commission, the parties therein named appeared before the subscriber, as auditor, with their counsel. The defendant proposed to shew, by parol testimony, that according to the true intent of the parties to the mortgage deed, the conveyance was to be defeated by the payment, not of the amount of the certificate in said deed specified, but by another and less sum, for the

payment of which sum the said certificate was given in pledge. The auditor supposed that said commission authorized him only to allow such legal or equitable claims and off-sets as he should prove, and deduct the same from said judgment. The auditor did not, therefore, receive the first proposed testimony. He, however, consented to receive evidence of all claims and off-sets, but none was offered.

George B. Upham."

That there was no other report from the auditor.

To the inquiry, "was such report prevented for the reasons as set forth in the bill?" they answer, that they know of no reasons but such as appear in the auditor's report; that they claimed then, and now claim, that $5000 was due at the time of the rendition of the judgment; that they have always been ready to go into any account, on legal or equitable principles, with the complainant, to ascertain what sums, if any, ought to have been allowed on said judgment, which were not, and to apply the same under said agreement, but the complainant would not.

The answer of Thomas Bellows states, that on or about Sept. 17, 1823, he signed a note with Stone & Bellows for $2900, on one year, with interest. His impression is that he signed the note at the request of Josiah Bellows, 2d. Stone & Bellows, or Josiah Bellows, senior, agent of Josiah Bellows, 3d, procured Josiah Bellows, 2d, to make the mortgage of the Stanley farm to him, and it was made for the purposes mentioned in the condition, and none other; it being understood and agreed between Stone & Bellows and Thomas Bellows that he should hold it for his indemnity, and pay to them whatever sums he might receive on said mortgage and certificate, beyond his own claim; or, on being indemnified by Stone & Bellows, to convey the same to them. He never knew that the certificate mentioned in the bill was other than the property of Stone & Bellows; that he knows of no other trust or agreement relative to the same.

The answer then states the judgment at law, May term,

Bellows v. Stone.

1832 ; the entry, attornment, and foreclosure, as in the other defendant's answer, and also denies accident, mistake and confederacy.

The deposition of Thomas Carlisle, taken on behalf of the complainant, states that Stone & Bellows held a note against James Dewey & Co. (of which firm deponent was a member,) and on surrender of the same received a certificate to the same amount in the effects of Thomas Carlisle & Co. ; that said certificate was entirely distinct from the $5300 certificate, which Josiah Bellows, 2d, procured to be made to Stone & Bellows ; that prior to September, 1823, (when the last named certificate was made,) said Bellows, 2d, had mortgaged the locks, &c., at Lebanon, to Stone & Bellows, to indemnify them for signing a note with him to the Cheshire Bank, and in order to procure a reconveyance of the same. Josiah Bellows, 2d, then induced Thomas Bellows to sign a new note with him to the Bank, and also to allow a certificate of preferred debt for $5300, to which said Thomas was entitled from Carlisle & Co.'s estate, to issue to Stone & Bellows, as a security that the new note to the Cheshire Bank should be paid. The new note was made to pay the balance due upon the prior note to the Bank.

At the same time, said Josiah made a mortgage to said Thomas of his farm in Lancaster, conditioned for the payment of said $5300 certificate, and the deponent afterwards remitted to Stone & Bellows $2200 on account of the said certificate, which was, he believed, understood at the time by all to be a substitute for the locks and canals, and to remain as collateral security in the same manner.

Mr. Carlisle was present in court when the judgment was rendered in the action on the mortgage, and understood the proposal to be that judgment should be rendered for the plaintiff, and the whole matter in controversy be referred to G. B. Upham, as an auditor.

He was also present at the hearing before the auditor, and testified that " said Josiah Bellows, 2d, called upon the plain-

tiff to produce his accounts against him. The reply to this request was, he had nothing but the judgment rendered against him in Coos County, and whatever he had to bring in to reduce said judgment would be a settlement of all matters between them."

It also appeared, from the deposition of Jonathan Smith, taken by the complainant, that he was the counsel of J. Bellows, 2d, in the action on the mortgage, and at the May term, 1832, applied for a continuance, and that it should be referred to Mr. Upham to ascertain the sum due on the mortgage, and report the amount due, at the next term of said court. To this the plaintiff's counsel objected, on account of delay; but proposed to take a judgment at that term for a nominal sum in damages, which was to stand as security for the amount which might be found due, and then to have it referred to Mr. Upham, as had been proposed. This was acceded to by Mr. Smith, who proposed $2000; observing that it would be more than sufficient to cover the sum due. Said plaintiff's counsel thought not, and proposed $5000, to which Mr. Smith acceded, observing that it would make no difference whether it were $2000 or $5000. The plaintiff's counsel reduced this agreement to writing, and it was signed just as the court was about to adjourn.

Mr. Smith farther testified that it was agreed and understood between himself and the opposing counsel, that whenever the sum due on said mortgage should be ascertained by said Upham, the judgment aforesaid should be reduced, so as to correspond therewith.

The complainant also put in the deposition of A. N. Brackett, who was present in court at the time of said agreement, and heard the conversation between the counsel in that action. Mr. Smith, for the defendant, asked a continuance, as the mortgage on which the action was founded grew out of an old unsettled affair, which required considerable time and attention to adjust properly. A continuance not being granted, Mr. Smith proposed Mr. Upham as an auditor, to adjust

Bellows v. Stone.

the claims between the parties, and a nominal judgment was finally agreed upon for $5000, to be reduced to such an amount as Mr. Upham should find justly due on a consideration of the whole case.

Mr. Brackett testified that he was confident that the case was expressly defaulted on the ground that a hearing in equity should be had, and that the entry on the docket of May term, 1832, is such; and that Mr. Upham's being competent to go into the whole matter was the reason why the agreement to take the nominal judgment for $5000 was ultimately entered into and signed.

The defendants introduced the deposition of Josiah Bellows, senior, who testified that he was acting as the agent of Stone & Bellows at the time the Stanley farm mortgage was made; that the certificate and mortgage were received as a substitute for the locks, canals and mills, and that Stone & Bellows retained their lien upon the Lebanon farm, which was included in the same mortgage. The deponent could not say for whose benefit or at whose procurement Thomas Bellows signed the $2900 note. Josiah Bellows, 2d, undertook to get the mortgage made to secure the certificate. It was made first to H. Bellows, but the deponent objected, and proposed Stone & Bellows, but finally agreed that it might run to Thomas Bellows, who had some interest in the payment of the sums intended to be secured by the mortgage.

The same witness farther deposed, that at the time said mortgage was made, Stone & Bellows held the $5300 note secured by the Lebanon property, and the same was treated throughout as being all due, and nothing was said to the contrary. He knows of no other indebtedness from Josiah Bellows, 2d, to Stone & Bellows, existing at that time. The writ of entry on the mortgage was procured by this deponent acting for Stone & Bellows. He then exhibited their account to the complainant, who acknowledged the same to be correct in all but one item. He does not remember the amount of that account.

The defendants also introduced the deposition of Joseph Bell, who was counsel for the demandant in the action to foreclose the Stanley farm mortgage. He deposes that at the second term the forfeiture was confessed, and that he then moved to have the damages assessed, whereupon Mr. Smith asked a continuance ; some conversation ensued, and resulted in the written agreement for judgment, and a reference, as already stated. Mr. Bell farther states, that he believes the agreement was drawn up in conformity with the agreement made between the counsel, and without mistake or error ; and that as he was instructed that the sum due and the certificate exceeded five thousand dollars, after allowing all deductions and off-sets, he could not have agreed to a smaller sum, but concluded to take that rather than to protract litigation.

After the proceedings before the auditor, things remained as before until February 9, 1833, when Mr. Bell took out a writ of possession on said judgment, which he retained in his own hands, and wrote to the complainant to that effect, and enclosed to him a draft of a lease of the Stanley farm, with an intimation that if the same were returned duly executed, the writ of possession would not be executed, otherwise it would. The deponent soon after received the lease, duly signed and sealed by the present complainant.

*Livermore*, for the complainant. I. Upon the facts in this case, our first position is, that, admitting a valid foreclosure of the mortgage of the Stanley farm to have been effected, and the legal estate thereof unconditionally vested in Thomas Bellows and his heirs, still his answer, supported by the joint answer of Stone & Bellows, shows that he holds the farm only in the capacity of a trustee. He claims no interest in it beyond his own indemnity, which, being effected, he is bound, and upon the strength of his answer only will be decreed to convey the farm to the person entitled. The end and purpose of a trust being satisfied, it results to the source

from which it sprang. 1 *Cruise* 475; *Fonb. Eq.*, *b.* 2, *ch.* 2, § 4, *in notis*, cites 2 *Atk.* 155.

His interest in the land is coëxtensive with his interest in the certificate, to which it is merely an accessory, and which it therefore attends into whose hands soever the certificate may fall, and through all the limitations to which, by the agreement of parties or implication of law, it is liable. 5 *N. H. Rep.* 420, *Southerin* vs. *Mendum;* 2 *J. C. R.* 100.

II. Our second position is, that, by reason of the mistake charged, there has been no foreclosure.

That the mistake may be shown by parol evidence, notwithstanding the answer denying it, *see* 2 *J. C. R.* 585, *Gillespie* vs. *Moon*, and a recent case to the same point in *Mylne & K.'s Rep.*

For a similar practice to that adopted in this case, *see Caldwell on Arbitration* 60; *Tidd* 816.

As to understanding of counsel, *see* 1 *Sumner* 218, *Hazard* vs. *N. E. M. Ins. Co.*

*H. A. Bellows*, for the defendants. The relief prayed for is, to be permitted to redeem without seeking to vacate the judgment.

I. Waiving that consideration for the moment, the question is, was the agreement in regard to the judgment by mistake or accident erroneously entered up.

As to the reforming of contracts, *see* 1 *Story's Eq.* 171, 172. As to the character of the evidence on which they may be reformed, 1 *Story's Eq.* 164, 5; and the nature of the mistake, 1 *Story's Eq.* 169; 2 *Johns. Chanc. Rep.* 585, 595, *Gillespie* vs. *Moon;* 2 *Ditto* 630, *Lyman* vs. *United Ins. Co;* 1 *Ves.* 317; 6 *Ves.* 328, 329; 1 *Bro. Ch. Rep.* 338, 347, *Shelburne* vs. *Inchiquin;* *Blake Ch. Practice* 21; 2 *Johns. Ch. Rep.* 274, *Ex'ors of Getman* vs. *Beardsley.*

II. The bill charges that by the agreement the claims of *both* parties were to be submitted to the auditor, and goes upon the ground of a *mutual mistake.* Now we say, *first,*

# 188 COOS.

that the plaintiff must prove his case as he states it. 2 *Ball
& Beatty* 444, 451, *Savage* vs. *Carroll ;* 1 *Chitty's Eq. Dig.*
47. And, *secondly*, that the contract cannot be reformed,
because, as no contract was in fact made, the parties laboring
under a mutual misapprehension, there is nothing to reform
by. The court at most can only cancel it and vacate the
judgment.

Equity will relieve in cases of fraud, or of an innocent
omission or insertion, or against a deed founded upon a mu-
tual misconception. 1 *Fonb. Eq. ch.* 2, § 8, n 2; 1 *Vesey*
456, 458, *Baker* vs. *Paine ;* 3 *Atk.* 388; 1 *Bro. Ch. Rep.*
338, *Shelburne* vs. *Inchiquin ;* 1 *Ves. & B.* 165, 168, *Rams-
bottom* vs. *Gosden.* But wherever the interference has been
on the ground of mistake, the mistake has been mutual.

III. Although a court of equity will receive parol evidence
of a mistake in drawing up an agreement, for the purpose of
*resisting a decree* for a specific performance, it is not admis-
sible, on the part of the plaintiff, to procure a *reformation* of
the written articles, and a decree thereupon.

As to rejection of parol evidence to contradict, add to, or vary
the terms of a written contract, 2 *Stark. Ev.* 996, 1002,1007 ;
2 *Phil. Ev.* 753 ; 8 *Johns.* 189, *Thompson* vs. *Ketcham ;*
7 *Mass.* 518, *Hunt* vs. *Adams ;* 17 *Mass.* 303; 11 *Mass.*
27, *Stackpole* vs. *Arnold ;* 1 *Fairfield* 418, *Lincoln* vs. *Avery ;*
5 *Greenl.* 496 ; 3 *Fairfield* 470 ; 2 *Hayw.* 32 ; 3 *N. H.
Rep.* 132, *Barry* vs. *Morse ;* 6 *N. H. Rep.* 205, *Bell* vs.
*Morse ;* 4 *Greenl.* 497 ; 8 *Johns.* 375 ; 2 *Wm. Blk.* 1249 ;
1 *H. Blk.* 664. And the rules of evidence are generally the
same in courts of equity and courts of law. 2 *Stark. Ev.*
1018; 17 *Mass.* 303; 1 *Fairf.* 85 ; 2 *Chitty's Eq. Dig.*
969; 1 *Atk.* 453 ; 2 *Ves.* 41; 2 *Story's Eq.* 746. As to
what will be received in evidence, see *Fonb. Eq. b.* 6, *ch.*
1, § 1, and 2 *Ditto, b.* 6, *ch.* 2, § 7; 2 *Salk.* 675; 1 *Mad-
dock's Chanc.* 322 ; 1 *V. & B.* 524; 2 *Ball & B.* 15; 2
*Chitty's Eq. Dig.* 975 ; 6 *Vesey* 328; 4 *Bro. Ch.* 514; 17
*Mass.* 320 ; 6 *Vesey* 334, *note ;* 1 *Vesey, Jr.*, 326; *Ditto*

241; 1 *Cox* 402; *Ditto* 219; 2 *Swans.* 244; 18 *Ves.* 10; 1 *Chitty's Eq. Dig.* 50.

As to cases where the courts will or will not refuse specific performance in case of a mistake, 10 *Ves.* 294; 2 *Dow.* 510; 1 *Chitty's Eq. Dig.* 52; 7 *Ves.* 211; *Ditto* 133; 4 *Bro. C. C.* 479; *Ditto* 219; 1 *Ditto* 92.

The recent English cases are explicit against admitting parol evidence to vary written contracts, except on the part of a defendant to raise an equity to resist specific performance. *Woolam* vs. *Hearn*, 7 *Ves. Jr.* 211; *Shergold* vs. *Boone*, 13 *Ves. Jr., Sumner's Ed.*, 370, *note; Clarke* vs. *Grant*, 14 *Ves. Jr.* 519; *Fell* vs. *Chamberlain*, 2 *Dick.* 484; *Ramsbottom* vs. *Gosden*, 1 *Ves. & B.* 165; *Winch* vs. *Winchester*, 1 *Ves. & B.* 375; *Higginson* vs. *Clowes*, 15 *Ves. Jr.*, 516; *Clinan* vs. *Cooke*, 1 *Sch. & Lef.* 22, 36; *see, also,* 17 *Mass.* 303, *Dwight* vs. *Pomeroy;* 1 *Fairfield* 81, *Elder* vs. *Elder.*

IV. Courts of equity will not set aside judgments in the courts of law for any misconception of the party seeking relief in the mode of managing his cause, nor for mistake in the rule upon which judgment was rendered, nor for any irregularity. 3 *Johns. Ch. Rep.* 275; *Cary's Rep.* 3; 1 *Chitty's Eq. Dig.* 592; 2 *Porter's Rep.* 262.

V. We say that, upon such a state of facts as are set up in this plaintiff's bill, a court of law would have furnished an ample remedy; that upon an application to the court the agreement would have been suppressed, on due proof of the mistake. He having, therefore, chosen to lie by and allow the foreclosure to take effect, has no claim to relief in this court. *Turner* vs. *Turner*, 1 *Swans. Rep.* 154; 2 *Swans.* 243; 14 *Ves.* 31; 2 *Bro. C. C.* 641; 1 *Maddock* 64; 3 *Johns. Ch. Rep.* 275; 4 *Johns. Ch. Rep.* 208.

VI. The application of the plaintiff, being addressed to the discretion of the court, and it being competent for them, on a consideration of the equity of the case, to grant or withhold relief, we say that the plaintiff has shown nothing

which entitles him to the extraordinary exertion of the powers of the court.

VII. After judgment at law and execution, equity will not entertain a bill for relief. *Adams* vs. *Dodsworth, Cary* 76 ; 1 *Chitty's Eq. Dig.* 584.

*S. Hale,* on the same side.

PARKER, C. J. There is one aspect of this case which seems not to have attracted the attention of the parties.

The mortgage which the plaintiff seeks to redeem is made to secure the payment of a certain certificate, issued by the agent of the creditors of Carlisle & Co., and purporting to contain evidence that the defendants, Stone & Bellows, were entitled to receive from the avails of the effects assigned by Carlisle & Co. for the benefit of their creditors, the sum of $5300.

The mortgage is given to Thomas Bellows, but it appears that he, at the time of its execution, held the certificate as a security to indemnify him for signing a note of $2900 to the Cheshire Bank, as security for Stone & Bellows. Beyond the purpose of this indemnity he held the certificate and the mortgage in trust for the benefit of Stone & Bellows.

But it appears, also, that their interest in the certificate was not originally an absolute interest, subject only to the right of Thomas Bellows to hold it for his indemnity, and to appropriate the avails of it, so far as might be necessary, for that purpose. The bill avers, and the answer of Stone & Bellows admits, that they held this certificate as a collateral security. The parties, however, are not agreed as to the character of the claims and demands for the security of which the certificate and mortgage were taken by Stone & Bellows; and the controversy here seems to be a material one.

The bill alleges that Stone & Bellows had become liable as indorsers for the plaintiff at several banks, particularly at

the Cheshire Bank ; that to relieve himself from these lia-
bilities and to secure them, he procured them to raise $2900
for him at the Cheshire Bank, on their note, indorsed by
Thomas Bellows ; and, for the purpose of *paying that note*,
and to *indemnify* Stone & Bellows for *any other liabilities
they might be under on his account*, the plaintiff procured
the certificate to be made to them, *and for that purpose
alone;* that, to indemnify Thomas Bellows for signing the
note, he made the mortgage with the condition that he would
pay or cause the certificate to be paid.

It avers that there is a balance of $300 and some interest
due on the note to the bank, and that the plaintiff is not in-
debted to Stone & Bellows, or either of them, in any other
sum, or for the payment on his account of any other sum.
It alleges that he is ready to pay all such sums of money as
may be justly due them on account of the premises, and in-
sists that, upon the payment thereof, he is entitled to have
the farm freed and discharged from the mortgage, and to a
return of the certificate.

It states that, during the pendency of the suit at law found-
ed upon the mortgage, he moved that an auditor might be ap-
pointed, to ascertain the sum due in the premises ; and al-
though it states an agreement that an auditor should be
appointed, to audit *the accounts between Stone & Bellows and
himself*, and to ascertain the sum justly due between them,
and that they appeared before the auditor, to have *the claims
between them* settled, and the balance ascertained, yet, in al-
leging the plaintiff's attempts to procure a settlement before
that time, the bill states that he called upon Stone & Bel-
lows to render an account of the avails of the certificate and
the amount of their payments in respect thereof, and to come
to an adjustment of *all the said concerns* and business be-
tween them.

It alleges that the defendants have never rendered any
account in the premises ; that they sometimes pretend that
the certificate was not given as collateral security to indem-

nify them against the note to the bank and such other liabilities as they might have been under for and on account of the plaintiff; whereas the plaintiff expressly charges the contrary to be the truth, and that it was procured and delivered as collateral security, to indemnify them against the liabilities aforesaid, and was given as the proper debt of Carlisle & Co. to him, and for no other account or consideration whatever. The defendants are interrogated whether the certificate was not made and delivered to Stone & Bellows to indemnify them for executing said note, and upon the consideration as set forth in said bill of complaint. The bill then prays that Stone & Bellows may render an account of all sums of money paid by them upon the note, and for all sums of money paid by them or either of them for any liabilities which they or either of them were under for or on account of the plaintiff; that an account may be taken; that, upon payment of the balance of the account so taken, the plaintiff may be at liberty to redeem, and that the certificate may be returned.

The answer of Stone & Bellows, after some preliminary statements of the dealings between the parties, sets forth that April 19, 1822, the plaintiff made a note to them of $5338.35, as security for subsisting debts and liabilities and those which afterwards might arise to them, and secured the note by a mortgage of mills, locks, &c. at Lebanon; that on the 9th of September, 1823, the plaintiff was indebted to them in the sum of $5149.46, according to the account annexed to the answer, for debts due to them, monies advanced, and services rendered, for the security of which they held the mills, locks, &c. at Lebanon, thus mortgaged; that the plaintiff, being desirous of selling that property, proposed to substitute for it the certificate for $5300, mentioned in the bill, and another certificate, to be held by them for all sums then due, all monies advanced, &c., and that, they objecting to the sufficiency of the security, the plaintiff proposed to secure the first certificate by a mortgage of the farm now sought to be redeemed; that they, having occasion

to borrow $2900 of the Cheshire Bank, procured Thomas Bellows to sign the note as their security, undertaking to have the farm mortgaged to him, to be held by him for his indemnity, and in trust also, to pay them whatever he might receive beyond that upon the mortgage and certificate, or to convey to them upon being indemnified; that this was done, and that they released to the plaintiff the Lebanon property.

The answer then denies that the plaintiff procured them to raise $2900 at the Cheshire Bank for his use, and alleges that they had already paid all the debts there and elsewhere for which they had been holden on his account, and that the certificate was delivered to them to secure to them *whatever sums were then due and owing to them from the plaintiff, or which might become due to them on his account, and for no other purpose,* and that the mortgage was made for the pur- pose aforesaid, and no other purpose.

This is a very different statement in relation to the matter for which the certificate and mortgage were to be security, from that contained in the plaintiff's bill. The *bill* alleges that the certificate was made and the mortgage executed for the purpose of paying the note to the Cheshire Bank and to indemnify Stone & Bellows for any other liabilities they might be under on account of the plaintiff. The *answer* states a distinct indebtedness of the plaintiff to them in a large sum at the time of the transaction, and that the certi- ficate was expressly made to them to secure that and what might afterwards arise, and that the mortgage was executed for farther security, they releasing another mortgage which they before held.

Without adverting at present to the impediments to the redemption, (which the defendants contend are insuperable, and the plaintiff maintains may be overcome in the proceed- ings,) the inquiry, in the first place, seems to be whether the allegations of the bill, to which we have already referred, stating the nature of the indebtedness which the mortgage was made to secure, are in fact sustained on the case before

us. The difference between the parties on this point, as shown by the pleadings, is, whether this mortgage should stand as a security only for such liabilities as Stone & Bellows were under for the plaintiff at the time of its execution, or whether it was made as a security also for all debts and demands then due from the plaintiff to them.

It is not important at this stage of the proceedings to inquire whether there are, in fact, any debts now due from the plaintiff to them, except such as have arisen out of such liabilities. Nor is it of consequence to ask whether there is any thing in them except what arises from the note of $2900. The bill alleges that there is nothing due except the balance of that. It is not essential to the maintenance of this suit that the allegation should prove to be true. If there is anything else due them arising out of liabilities existing at the date of the mortgage, the bill asks an account of it, and avers a readiness to pay the amount in redemption of the premises. But the bill takes no note of any other description of debt which may be due to them.

If, then, no impediment exists to a redemption, and an account is to be taken and a redemption decreed, it must be because the plaintiff has sustained the allegations and maintained the rights set forth in the bill, and because the mortgage was made to secure the description of debts which he alleges, and he is entitled to have an account taken of the same, and to redeem on the payment of the amount. The defendants cannot, in such case, tack any thing else to the redemption.

But, if it appears that the mortgage and certificate were to secure debts due directly from the plaintiff to Stone & Bellows, the fundamental averments of the bill, upon which all the others rest, are disproved, and the superstructure falls. Upon this bill the court are not called upon to cause an account to be taken of all the debts due from the plaintiff to Stone & Bellows, for the plain reason that the plaintiff states no such agreement, asks for no such account, professes no read-

iness to pay the balance of it when taken, and prays no decree of redemption based upon such a proceeding.

It is apparent, then, that the averment in the bill, that, by the agreement, the mortgage and certificate were to secure those liabilities only, is a material allegation, which the plaintiff must prove as laid, or fail to sustain his case, by reason of a variance between his allegation and the evidence. 9 *N. H. Rep.* 385, 393, *Tilton* vs. *Tilton; Gresley's Eq. Ev.* 171; 2 *Ball & Beatty* 444, 451, *Savage* vs. *Carroll.* A party cannot set up in his bill one contract, and obtain relief on evidence of another of an entire different character. *Harris & Johns.* 288, 293, *Drury* vs. *Conner;* 10 *Peters* 177, *Boone* vs. *Chiles.*

Is the plaintiff's allegation supported by the proof? The part of the answer of Stone & Bellows in which they deny this part of the bill, and aver that the certificate and mortgage were made to secure what is due to them, is responsive to the bill. They were required to state whether they held the certificate and mortgage in the manner stated in the bill, and it was not sufficient for them merely to deny that they held as security for liabilities alone. If they did not admit the allegation as made, but held the papers as security, they were bound to state for what they held them. This part of the answer must, therefore, be overcome by the plaintiff's evidence. But the answer is corroborated, to some extent, by the evidence on both sides. The mortgage of the Lebanon property has not been introduced in evidence. The answer states that it was to secure a note of $5388.35, and that this note was given to secure all debts; but there is no evidence on this point. That the certificate and the mortgage now in question was substituted for the mortgage of the locks, mills, &c. at Lebanon, is shown by the testimony of Josiah Bellows, senior, introduced by the defendants. The only evidence which tends to impeach the answer in this particular, is that of Carlisle, who says that he understood from the conversation that this mortgage was given to secure

only the $2900 note.  But it is clear that he is mistaken, for the bill, although it avers that there is nothing else due, admits that the security was for all liabilities ; and Carlisle, in answer to a cross interrogatory, says that this was substituted for the locks, mills, &c.   Those, however, he speaks of as mortgaged to indemnify Stone & Bellows for signing a prior note to the bank, the note of $2900 being given for the balance of it.   But this is, to some extent, inconsistent with the fuller evidence of Josiah Bellows, senior, that the plaintiff, who undertook to get the mortgage made to secure the certificate, had it made running to Hubbard Bellows ; that, acting as agent of Stone & Bellows, he objected to this, and proposed that it should run to them ; " but finally told Josiah Bellows, 2d, that, if he had any objection to that course, it might be executed to Thomas Bellows, who had some interest in the payment of the sums intended to be secured by the mortgage."   He says also that the note secured by the mortgage of the mills, &c. was, at the time of the giving of the new mortgage, in the possession of Stone & Bellows, and was treated throughout the transaction as being all due, and he did not then hear any thing to the contrary. He states farther, that, prior to the suit on the mortgage, he exhibited to the plaintiff the account of Stone & Bellows, which he acknowledged to be all correct except a charge for a demand against James Dewey & Co., which, he said, he never would pay.   The witness, however, is unable to recollect the amount of the account, but it is to be distinctly inferred from the whole case that it was not for the balance of the note to the Cheshire Bank only.

The evidence of the plaintiff, then, so far from overcoming the answer on this point, is itself overcome by the evidence of the defendants, and the bill is not sustained.

The plaintiff having failed to prove his case as alleged, the court might stop here and dismiss the bill.   The utmost the plaintiff could ask, upon a strict consideration of his

rights, would be that the dismissal should be without prejudice to his right to commence another suit.

But the power of the court extends to the granting of an amendment of the bill, even at this stage of the proceedings ; and, as the parties have proceeded to a hearing without presenting this question distinctly, and the plaintiff may desire to make this motion, we have considered the matters upon which the arguments of the parties have placed them at issue. We have done this the more readily, because this litigation has been protracted to an unreasonable length, and because, when it finally came to a hearing, the state of the business of the court was such as to cause some additional delay in the examination of the case.

The plaintiff makes no question in his bill that the condition of the mortgage was broken, nor that the suit upon it for possession was well instituted ; but he alleges a mistake in the agreement of the counsel upon which the conditional judgment was rendered for the sum of $5000, viz., that he understood the whole matter of a hearing in chancery was to be gone into before the auditor, notwithstanding that judgment, which was to stand as security only ; that he was applied to subsequently, and gave some writing respecting the possession or foreclosure, of which he prays a discovery ; and he sets forth that after that, and within a year, he attempted to have a hearing before the auditor, to ascertain the amount due to Stone & Bellows ; that he then offered to prove that the certificate was but a security, and requested Stone & Bellows to present their claims, which they refused to do, alleging that they had no claim but the judgment ; that the auditor decided that he could only allow such payments or matters of set-off as the plaintiff should prove, in reduction of the amount of the judgment, and that, in consequence of this decision, nothing was done.

The answer of Stone & Bellows denies any mistake in the agreement, denies that the judgment was nominal, and to stand as security only, admits the proceedings generally

before the auditor, and makes discovery of the writing executed by the plaintiff, which appears to be a lease duly executed by the plaintiff, April 1, 1833, reciting that Thomas Bellows had, at the May term of this court, A. D. 1832, recovered the conditional judgment as of mortgage, in his action against Josiah Bellows, 2d, for the possession of the Stanley farm, and that on the 1st of April, 1833, said Thomas had entered into, and taken possession of, said Stanley farm under said judgment, and for condition broken in his mortgage from Josiah Bellows, 2d.

And here the plaintiff is met by an objection on the part of the defendants, that the mortgage is foreclosed by the peaceable possession of the defendant, Thomas Bellows, for the term of one year next after the giving of this lease, that possession being held by the plaintiff as his tenant. The defendants contend that this operated as a foreclosure by the express provision of the statute, and that the court cannot now open it and permit the plaintiff to redeem, even if there was a mistake in the agreement upon which the judgment was entered.

There is no doubt that the possession of the plaintiff under the lease, acknowledging the title of Thomas Bellows, and covenanting to pay rent, is as good for the purpose of a foreclosure against the plaintiff as an actual personal possession by Thomas Bellows himself could have been. This possession was not obtained by any legal process issued under the judgment, but was obtained by the voluntary agreement of the plaintiff himself. The lease recites the rendition of the judgment; and the fact that it had been rendered, may have had its influence in inducing the plaintiff to yield up the possession and take a lease; but still the entry of Thomas Bellows was a peaceable entry, without process, by the consent of the defendant; and if he had had possession for the term of a year under it, without any attempt on the part of the plaintiff to redeem, or some proceedings which can be lawfully considered as keeping the redemption open, that pos-

session must, under the statute, operate as a foreclosure, notwithstanding any mistake in entering the judgment ; because the possession was not the fruit of the judgment, and because the plaintiff might have proceeded to redeem as if the judgment had not been entered ; and, if that was wrongfully interposed as an obstacle, might have proceeded to attempt to remove the difficulty.

But the possession is not of itself conclusive. Aside from any influence the judgment may have upon the case, a demand of an account by the plaintiff within the year, and a refusal or neglect by the mortgagee to render one, would operate to keep the foreclosure open. 9 *N. H. Rep.* 404, *Wendell* vs. *The N. H. Bank.* And this is precisely what the plaintiff alleges and proves was done.

Notwithstanding his bill sets out that the mortgage was made to secure Stone & Bellows for their liabilities on his account, and for that alone, it alleges that the parties met before the auditor, to have the claims between Stone & Bellows and himself settled, and the balance ascertained, and his evidence shows a request as broad as the allegation. It can make no difference that this was in the presence of an auditor, and on the occasion of a proposed hearing arising out of the judgment. Laying out of the case any justification for a refusal which is to be derived from the judgment, here is enough to keep the foreclosure open until the account is rendered, according to the express doctrine of the case just cited.

It is farther objected, that the court should not interfere, even if accident or mistake is clearly proved, unless it is also proved that injury has been sustained, or is possible, and that the plaintiff has made out no such proof, but that the contrary is apparent from the evidence. But this argument assumes that the state of the account is as set forth by the defendants in their answer, because there is not before the court sufficient evidence to disprove that account.

This does not seem to be the proper stage of the case to

settle the amount of the account. If the bill had alleged the agreement to be such as is stated in the answer, and prayed that an account might be taken, alleging that a less sum was due than that stated by the defendants, the course, in order to settle that question, would be to refer it to a master, to state the account; and upon that, farther evidence might be introduced and the state of the defendants' claims turn out to be different from what they allege them to be in the answer. We cannot, therefore, assume, on any computation in the case now before us, that there has been no injury, or that none is possible, if there has been mistake, and the judgment has been erroneously entered up, and wrongfully used as evidence of the amount of the claims of Stone & Bellows.

If the judgment had not been entered, and upon a hearing in equity the certificate had been admitted to be given as a security, it would have been incumbent on the mortgagee to show what demands were due to him. If it had been denied that the certificate was held in pledge or as security, that might have furnished a case for equitable relief.

It appears, therefore, that if the plaintiff had alleged in his bill that the certificate was made to Stone & Bellows as a collateral security for the sum due to them, as well as for their liabilities, he, having demanded an account within the year after Thomas Bellows took possession, might be entitled to maintain this bill, unless the rendition of the judgment in the suit at law interposes a bar to it.

We come, then, to the consideration of the effect of that judgment and the circumstances under which it was rendered. If it was rendered without mistake or misapprehension, and the construction contended for by the defendants, and placed upon it by the auditor, was correct, then the request for an account by the plaintiff was nugatory, or was complied with; because he had, by means of the judgment, which they produced in answer to his request, an account of the demands of the defendants ascertained by his own agreement,

except so far as he could reduce the amount by evidence of payments or matters in set-off on his part.

If duly rendered without mistake, and with an effect such as the defendants allege, they had only to point to the judgment, as they did do, and their account was furnished. In such a state of facts it would have been the duty of the plaintiff to reduce or pay the amount of it, in order to redeem ; and not having done so, the mortgage would have been foreclosed at the expiration of the year.

The next question is, was there any mistake in the agreement upon which that judgment was rendered ? and would the plaintiff be entitled to relief on a bill stating an agreement that the certificate should stand as security for all debts and claims due to Stone & Bellows ? It is objected, on the part of the defendants, that although a court of equity will receive parol evidence of a mistake in drawing an agreement, for the purpose of resisting a decree of specific performance, it is not admissible on the part of the plaintiff to procure a reformation of the written contract and a decree to enforce it.

There are authorities in support of this position, but there are, it is admitted, others against it, and the doctrine is strongly controverted in *Gillespie* vs. *Moon*, 2 *Johns. Ch. Rep.* 585 ; and the better opinion seems to be that a court of equity may receive such evidence, as well on a bill for a reformation and a specific performance, as when the party is resisting a bill of that character. In *Tilton* vs. *Tilton*, 9 *N. H. Rep.* 385, this court did not undertake to settle the question, but in that case we held parol evidence admissible to show a mistake in a deed.

The objection, however, is not one that could apply in this case, even if the principle contended for was undoubted. The plaintiff in his bill asks no reformation of any contract, nor for a decree that, when reformed, it shall be carried into execution. He states in his bill that, by accident and mistake, the agreement was erroneously drawn and executed, but he no where asks in terms that it should be altered or

reformed. His specific prayer for relief is that an account may now be taken and that he may be permitted to redeem. It is not necessary or proper, in order to do this, that any alterations should be made in the terms or stipulations of the agreement, and the matter be then committed to the auditor, to take the accounts for the purpose of correcting that judgment ; and it cannot be inferred, therefore, that the plaintiff asks such reformation and specific performance under his general prayer for other relief.

The prayer of the bill asks to have the agreement disregarded, and, if it be necessary in order to do this, that it should be set aside. The general prayer for other relief may perhaps include such a request, but there is nothing to show that the plaintiff now seeks to have an alteration made in the terms of that agreement, and then to have a hearing before Mr. Upham, the auditor, on the agreement thus corrected.

It is a familiar principle that equity may set aside an agreement, on a proper case made for that purpose, to sustain which we need not cite authorities.

But it is contended, on the part of the defendants, that here is no mistake ; that the writing was drawn precisely as the parties intended, and that there is nothing to reform ; that there must be a mutual mistake, in order to warrant a reformation ; and that a misapprehension of one party is not sufficient to warrant a reformation of a contract.

It is apparent that the court could not, in a case of that character, undertake to alter or reform the written articles; because, when reformed so as to constitute an agreement such as the party complaining of mistake intended, they would not contain the agreement which the other party understood he had entered into.

The evidence shows that Mr. Bell, the counsel for the defendants, understood the agreement to be as expressed in the written contract ; and there is no evidence to show that Mr. Smith, on the other side, supposed the terms of the agreement to be different from those set down in the writing.

There is no evidence that anything was inserted which he did not intend should have been, or anything omitted which he expected would have been inserted in it. But there is evidence that the construction put upon the written articles by the auditor, (and which perhaps was not the necessary construction,) was different from what Mr. Smith understood to be the true construction of the agreement he had entered into. This is fully made out by his evidence.

The parties, then, had a different understanding of the import of their contract; and the appropriate relief, if any ought to be granted, is not to reform the terms of this contract, but, as the defendant contends, to set it aside.

Here, however, the defendants farther contend that a court of equity will not set aside judgments of a court of law for any misconception of the party seeking relief in the mode of managing his cause, nor for a mistake in the rule upon which judgment was rendered, nor for any irregularity, and that the court of law in which the judgment was rendered would have furnished an ample remedy.

This objection seems to be well founded. Courts of equity, it is said, set aside judgments at law when they have been obtained by fraud, but not because of any error in the proceedings. This is not, perhaps, strictly speaking, an erroneous judgment; but if the agreement under which the judgment was entered, has operated otherwise than the parties intended, this court has power, as a court of law, to set aside the judgment on proper terms, and this relief could better be administered upon an application or petition, and rule to show cause, than by bill in chancery on the equity side of the court. If this were all the objection, the plaintiff might now make that application, and the court grant it, on such terms as should be reasonable.

It seems that the judgment has been used so as to operate differently from what the plaintiff anticipated; and if the construction given to the agreement by the auditor is the true one, we see not why it might not be used in the same

way on a reference to a master to take an account, so long as it stands as a valid judgment. It might be necessary, therefore, before any effectual relief could be granted to the plaintiff, if his bill had set forth the agreement rightly, that he should obtain an order of the court to vacate that judgment.

It is farther objected, that the plaintiff shows no case which should induce the court, in the exercise of a sound discretion, to interfere.

On the case before us it appears that he has not made out a case in which we can exercise any discretion. But if the case had exhibited a pledge of the certificate to secure all the debts due to Stone & Bellows, and their liabilities for the plaintiff, a mortgage predicated upon that, an attempt to foreclose, and a demand of an account within the year, with a neglect to render a proper one, (for such, as it appears, would be the plaintiff's case, if rightly stated,) and the judgment interposed no obstacle, we are not prepared to say that he would not have a valid claim to relief. There has been great delay, to be sure, but the plaintiff is not alone chargeable with it.

Upon the delivery of the foregoing opinion, *Livermore*, for the plaintiff, moved for leave to amend, saying that it was through oversight merely, and not by reason of any unwillingness to admit that the certificate was given as security for debts as well as liabilities, that the omission was made, and that it never was brought to his notice till the opinion of the court was given.

The Court gave the plaintiff leave to amend upon the following terms, viz.: that the plaintiff file a bond to pay rent from July, 1841, until he surrenders the possession, (unless he redeems,) or the court, upon cause shewn, will rescind the order in whole or in part; and also that the plaintiff pay the costs from 1841.